# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE ZALE CORPORATION      )     Consolidated
STOCKHOLDERS LITIGATION      )     C.A. No. 9388-VCP

## MEMORANDUM OPINION

Date Submitted: May 28, 2015
Date Decided: October 1, 2015

Seth D. Rigrodsky, Esq., Brian D. Long, Esq., Gina M. Serra, Esq., Jeremy J. Riley, Esq., RIGRODSKY & LONG, P.A., Wilmington, Delaware; Carl L. Stine, Esq., WOLF POPPER LLP, New York, New York; *Liaison Counsel for Plaintiffs and Member of Plaintiffs' Executive Committee*.

Gregory P. Williams, Esq., J. Scott Pritchard, Esq., RICHARDS, LAYTON & FINGER, PA, Wilmington, Delaware; Sandra C. Goldstein, Esq., CRAVATH, SWAINE & MOORE LLP, New York, New York; *Attorneys for Defendants Neale Attenborough, Yuval Braverman, Terry Burman, David F. Dyer, Kenneth B. Gilman, Theo Killion, John B. Lowe, Jr., Joshua Olshansky, and Beth M. Pritchard.*

Bradley R. Aronstam, Esq., S. Michael Sirkin, Esq., ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Joseph S. Allerhand, Esq., Stacy Nettleton, Esq., David P. Byeff, Esq., Robert S. Ruff, III, Esq., WEIL, GOTSHAL & MANGES LLP, New York, New York; *Attorneys for Defendant Signet Jewelers Limited.*

Michael J. Maimone, Esq., Gregory E. Stuhlman, Esq., GREENBERG TRAURIG LLP, Wilmington, Delaware; Alan S. Goudiss, Esq., Paula H. Anderson, Esq., Dennis D. Kitt, Esq., SHEARMAN & STERLING LLP, New York, New York; *Attorneys for Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated.*

**PARSONS, Vice Chancellor.**

This is a stockholder challenge to the now-completed merger between Zale Corporation and Signet Jewelers Limited. The plaintiffs, who owned Zale Corporation common stock before the merger, charge members of the Zale Corporation board of directors with breaching their fiduciary duties of loyalty and care. The plaintiffs also charge Signet Jewelers Limited and Merrill Lynch, Pierce, Fenner & Smith Incorporated, Zale Corporation's financial advisor, with aiding and abetting those fiduciary duty breaches.

Before me are motions by the three groups of defendants to dismiss the plaintiffs' consolidated second amended complaint under Court of Chancery Rule 12(b)(6). I have considered the parties' briefing and arguments and the relevant documents as to those motions. For the reasons stated in this Memorandum Opinion, I grant the motions as to Zale Corporation's board of directors and Signet Jewelers Limited, but deny them as to Merrill Lynch.

## I. BACKGROUND[1]

### A. Parties

Plaintiffs, Andrew Beyer, Marc Stein, Ravinder Singh, Mary Smart, and David Pill ("Plaintiffs"), were common stockholders of Zale Corporation ("Zale" or the "Company") at all relevant times.

---

[1] The facts are drawn from the well-pled allegations of Plaintiffs' Verified Consolidated Second Amended Class Action Complaint (the "Complaint"). Those allegations and facts drawn from documents integral to the Complaint are assumed true for purposes of the defendants' motions to dismiss. Notably, the documents integral to the Complaint include Zale's Definitive Schedule 14A filed with the Securities and Exchange Commission (the "SEC") on May 1, 2014 (the "Proxy").

1

The Complaint named three groups of defendants. The first, comprised of Defendants Neale Attenborough, Yuval Braverman, Terry Burman, David F. Dyer, Kenneth B. Gilman, Theo Killion, John B. Lowe, Jr., Joshua Olshansky, and Beth M. Pritchard (together, the "Board" or the "Director Defendants"), constituted the board of directors of Zale. Killion was also Zale's CEO and the only Zale insider on the Board. Burman was the Chairman of the Board. Before serving as Chairman, Burman was CEO of Defendant Signet Jewelers Limited ("Signet") until 2011. Attenborough and Olshansky were both high-level employees at Golden Gate Capital ("Golden Gate")—a private equity firm that was Zale's largest stockholder, with an approximately 23.3% stake—and Golden Gate's appointees on the Board. Golden Gate, which was not named as a defendant, also had a $150 million loan outstanding to Zale through which it received warrants for 25% of the Company's common stock. Burman, Olshansky, Dyer, and Gilman served on the Board's Negotiation Committee (the "Negotiation Committee").

Second, Defendant Signet is a Bermuda corporation headquartered in Hamilton, Bermuda. It is the largest specialty retail jeweler in the United States and the United Kingdom and was Zale's largest competitor, operating over 1,400 retail stores in the U.S. alone as of February 2013. Signet's common stock trades on the New York Stock Exchange (the "NYSE") under the symbol SIG.

Third, Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is the corporate and investment banking division of Bank of America. Merrill Lynch was engaged by both the Board and Golden Gate, as described herein. The

2

Director Defendants, Signet, and Merrill Lynch are referred to, collectively, as "Defendants."

Zale was a named defendant in the first consolidated amended complaint, but it was dismissed voluntarily after the Court denied Plaintiffs' motion for a preliminary injunction.[2] Zale was a Delaware corporation headquartered in Irving, Texas and a leading retailer of fine jewelry in North America. As of July 2013, Zale operated over 1,000 retail stores and 600 kiosks, mostly in shopping malls, in the U.S., Canada, and Puerto Rico through its brands Zales Jewelers, Zales Outlet, Gordon's Jewelers, Peoples Jewellers, Mappins Jewellers, and Piercing Pagoda. Before the events described herein, Zales traded on the NYSE under the symbol ZLC.

### B. Facts

### 1. The impact of the 2008 financial crisis on Zale's business, and Zale's turnaround program

Zale was severely impacted by the 2008 financial crisis and suffered declining sales that forced a number of its retail stores to close. To remedy these financial difficulties, Zale launched a long-term turnaround program in 2010 designed to improve profitability. This program included: (1) rebuilding its core merchandise assortment; (2) refining its marketing message; (3) investing in jewelry consultants; (4) improving retail productivity; (5) upgrading its executive, corporate, and field teams; and (6) improving

---

[2] Another defendant named in the first consolidated amended complaint, Carat Merger Sub, Inc. ("Merger Sub"), also was dismissed voluntarily. Merger Sub, a Delaware corporation and a wholly owned subsidiary of Signet, was created for the sole purpose of effectuating a merger with Zale.

its internal training programs. In addition, as part of the turnaround program, the Board, in July 2013, reviewed and approved a three-year business plan prepared by Zale's management that incorporated projections of management's expectations as to Zale's future financial performance (the "Business Plan Case Projections"). The turnaround efforts succeeded. In 2013, Zale returned to profitability for the first time since 2008, reporting net earnings of $10M on August 28, 2013.

### 2. Golden Gate proposes a secondary offering

In September 2013, Golden Gate notified Zale that it intended to sell its shares into the public markets in an IPO-like secondary offering (the "Secondary Offering"). To effectuate this offering, Golden Gate and Zale engaged Merrill Lynch as lead underwriter and filed a preliminary registration statement on Form S-3 on October 2, 2013 (the "Preliminary Registration Statement") with the SEC, proposing an offering price of $15.035 per share.[3] The Complaint alleges that prior to the Secondary Offering, and as a

---

[3] In their briefs, Plaintiffs and Defendants dispute the significance of this price. According to Plaintiffs, $15.035 represented the maximum per share offering price in the Secondary Offering. Compl. ¶ 3; Pls.' Answer Br. 10. Defendants disagree, arguing that this price was only an estimated price for purposes of the eventual fee to be paid for the definitive registration statement, calculated by averaging the high and low prices of Zale's common stock on September 30, 2013. Signet and Zale Defs.' Opening Br. 7. The Preliminary Registration Statement itself, which is incorporated by reference in the Complaint, comports with Defendants' description of the price. It states that the "Proposed Maximum Offering Price Per Share" of $15.035 is "[e]stimated solely for the purpose of calculating the registration fee pursuant to Rule 457(c) under the Securities Act of 1933, as amended, based on the average of the high and low prices of the common stock on the New York Stock Exchange on September 30, 2013." Aronstam Aff., *supra* note 3, Ex. B, at 2 n.(2). Because this statement is consistent with Rule 457(c), the pertinent part of which states that "the registration fee is to be calculated upon the

4

result of the turnaround program, Zale's share price steadily had been rising and that the upward trend was halted and capped by the price quoted in the Preliminary Registration Statement. On October 6, 2013,[4] Signet reached out to Olshansky to discuss a possible acquisition of Zale.

### 3. The Board receives acquisition proposals from Signet

In 2006, before the events described above, Burman, then-CEO of Signet, contacted Richard Marcus, then-Chairman of Zale, to discuss a possible strategic acquisition. These negotiations progressed to some degree, but did not result in a definitive agreement. In 2011, Burman left his post as Signet's CEO and was replaced by Michael Barnes. In 2013, Attenborough and Olshansky approached Burman about joining Zale's Board as Chairman. He assumed that role in May 2013.

It was Barnes who approached Olshansky in October 2013 to discuss a potential merger between the companies. Olshansky indicated that any proposal should be communicated to Burman. On November 6, 2013, Barnes responded by contacting Olshansky again to tell him that Signet was finalizing a proposal for the Board. The next day, the Board received an offer from Signet to purchase all of Zale's outstanding common stock for $19 per share in an all cash deal. The proposal also stated that Signet

---

basis of the price of securities of the same class, as . . . the average of the high and low prices reported in the consolidated reporting system []for exchange traded securities," 17 C.F.R. § 230.457(c) (2011), of which I take judicial notice, I accept Defendants' explanation as the correct one.

[4] The Complaint alternatively describes this date as October 6, 2013 and October 6, 2014. *See* Compl. ¶¶ 4, 51, 54. Based on the context provided in the Complaint, I assume the correct year is 2013.

would require Golden Gate to enter into a voting agreement (the "Voting Agreement"). Golden Gate responded to this offer by cancelling its secondary offering, but, as Plaintiffs emphasize, neither Golden Gate nor the Board disclosed this cancellation to the public.

### 4. The Board forms the Negotiation Committee and engages Merrill Lynch as financial advisor

On November 8, 2013, the Board met to consider Signet's proposal. At that meeting, the Board retained Cravath, Swaine & Moore LLP ("Cravath") as its legal advisor and approved the formation of the Negotiation Committee to consider possible financial advisor candidates. The Board agreed that Merrill Lynch should be considered, based on their historical relationship with Zale and their involvement with the Secondary Offering, "unless a conflict or other consideration affected representation."[5] The Negotiation Committee then met with Merrill Lynch on November 11.

At the November 11 meeting, Merrill Lynch made a presentation to the Negotiation Committee describing its history with Zale and good working relationship with Zale's management. Merrill Lynch also represented that it did not expect its previous relationship with Golden Gate, through the Secondary Offering, to impact its ability to advise the Board and that it had "limited prior relationships and no conflicts with Signet."[6] In fact, Merrill Lynch received approximately $2 million in fees from Signet from 2012 to 2013. More significantly, Merrill Lynch had, on October 7, 2013— one day after Barnes initially indicated to Olshansky that Signet was interested in a

---

[5] *Id.* ¶ 62.

[6] *Id.* ¶ 78.

transaction with Zale and while Merrill Lynch was working on the Secondary Offering—made a presentation to Barnes and Signet's CFO regarding a possible acquisition of Zale. This presentation was aimed at soliciting business from Signet and proposed an acquisition of Zale at a value of between $17 and $21 per share. Jeffrey Rose, a managing director at Merrill Lynch, was a senior member of both the team that made the presentation to Signet and the team that eventually was engaged to advise the Zale Board during the merger process. Neither Rose nor Merrill Lynch disclosed to the Board that they made this presentation to Signet until March 23, 2014, which was after the merger agreement was signed, in connection with the preparation of the Proxy.

The Negotiation Committee, without interviewing any other candidates, recommended that the Board engage Merrill Lynch as financial advisor. The Board adopted this recommendation on November 18, 2013 and structured its engagement such that most of Merrill Lynch's fee was contingent upon the consummation of a merger.[7]

### 5. The Board considers the Signet proposal and other strategic alternatives

On November 18, 2013, the Board met again to discuss the potential sale of the Company. The Board first addressed potential conflicts among the Director Defendants, including: (1) the fact that Burman was formerly the CEO of Signet and still held 1,850 shares of Signet common stock; (2) Attenborough and Olshansky's roles as employees of Golden Gate, who had an outstanding loan to Zale that would earn a prepayment fee upon

---

[7] According to the Complaint, Merrill Lynch stood to earn $2 million if the Board decided not to enter into a merger and $12 million if a merger was consummated at a price of $21 per share. *Id.* ¶ 82.

a change of control; and (3) Killion's and Burman's compensation arrangements that would allow certain of their restricted Zale common shares to vest early upon a change of control. After considering each of those issues in turn, the Board determined that none of these conflicts were material and that each Director Defendant's interests were aligned with the other Zale stockholders.

Merrill Lynch then made a presentation to the Board that included a "Summary Valuation of Strategic Alternatives" in which Merrill Lynch "projected the share price of Zale under different alternative scenarios [including five standalone options and a leveraged buyout option] and then calculated the present value of that future stock price."[8] Merrill Lynch evaluated each of these different strategic alternatives using "upside case" projections (based on management's Business Plan Case Projections) and "base case" projections (based on Merrill Lynch's less optimistic projections) and presented the following share price valuation ranges for each strategic alternative under each of the two sets of projections:

| Projections | Status Quo | Leveraged Recapitalization | Sale of Pagoda | Sale of Canada | Sale of Pagoda & Canada | Leveraged Buyout |
|---|---|---|---|---|---|---|
| Base Case (i.e., Alternative Case) | $15.25 - $19.70 | $15.70 - $20.10 | $14.45 - $18.60 | $15.30 - $19.15 | $15.70 - $19.05 | $11.80 - $16.40 |
| Upside Case (i.e., Business Plan Case) | $19.55 - $25.25 | $20.00 - $25.60 | $18.55 - $23.90 | $19.55 - $24.65 | $19.75 - $24.25 | $14.86 - $20.25 |

---

[8]    *Id.* ¶ 64.

After considering each strategic alternative, the Board decided to pursue a merger with Signet.

At that same November 18, 2013 meeting, the Board also asked Merrill Lynch to consider the potential for transactions with other strategic buyers. The Board decided, however, to "defer any decisions regarding the nature of the market check to be undertaken until a later time after further discussion."[9]

### 6. The Board's merger negotiations with Signet

On December 3, 2013, the Board received a second letter from Signet indicating that it would increase its offer price to $19 per share in cash plus $1.50 in Signet common stock. The Board met two days later, on December 5, and decided to enter into a confidentiality agreement with Signet and to allow Signet to perform due diligence on Zale.

The Board also returned to the topic of a transaction with other strategic buyers. According to the Complaint, Merrill Lynch consistently advised the Board throughout the merger process that a transaction with another strategic buyer was unlikely. The only indication of interest came on January 10, 2014, when a financial advisory firm representing Gitanjali, an Indian jewelry retailer and manufacturer, contacted Olshansky regarding a potential transaction. The Board responded to this overture by stating that they would not permit Gitanjali to perform due diligence without at least an initial indication of price and availability of financing. Gitanjali never replied.

---

[9]     *Id.* ¶ 68.

As the merger negotiations continued through January 2014, the deal's contours began to take shape. On January 16, 2014, Barnes informed Killion that Signet planned, post-merger, to keep Zale as a separate division within Signet, and it wanted Killion to continue to lead that division from its headquarters in Texas. Killion also allegedly stood to earn nearly twice as much as the head of a division within Signet as he was earning as Zale's CEO. On both January 27 and February 6, the Board met to discuss the announcement by Corvex Management, a New York-based hedge fund, of its acquisition of a substantial ownership stake in Signet. After considering this development, the Board concluded that Corvex's announcement likely had prompted Signet's desire to proceed more quickly with a potential transaction with Zale and was a favorable development for the Company.

On February 10, Signet again contacted the Board to inform them that the offer of $20.50 per share would be all cash rather than a mixture of cash and Signet common stock. The Board countered this offer by notifying Signet that they would be willing to proceed with a transaction if Signet increased the price to $21 per share in cash. The next day, Signet increased its offer to $21 in cash. On February 15, as part of their ongoing negotiations over the Voting Agreement, Golden Gate requested assurances that "it [would] be compensated by Signet in the event that Golden Gate's exercise of its warrants prior to the record date would result in effective proceeds to Golden Gate of less than the $21.00 per share deal price."[10] Finally, on February 18, Merrill Lynch reviewed

---

[10]     *Id.* ¶ 77 n.2.

10

its financial analysis of Signet's proposal and delivered its opinion to the Board that the merger would be fair to Zale from a financial perspective.

## 7. The merger announcement and the merger agreement

On February 19, 2014, Zale and Signet issued a joint press release announcing a $690 million deal, under which Signet would acquire all of Zale's outstanding common stock at a price of $21 per share (the "Merger Price") and Zale would merge with Merger Sub and become a wholly owned subsidiary of Signet (the "Merger"). That same day, Zale filed the definitive merger agreement (the "Merger Agreement") with the SEC. In addition to describing the Merger's consideration ($21 dollars per share in cash) and structure (Zale would merge with Merger Sub and become a wholly owned subsidiary of Signet), the Merger Agreement provided for certain deal protection devices. Those devices included: (1) a "No-Solicitation" provision prohibiting Zale from soliciting superior offers from other buyers, subject to a "Fiduciary Out"; (2) a "Matching Right" granted to Signet for any "Superior Offer" submitted to Zale; and (3) a "Termination Fee" of $26.7 million, payable to Signet if the Board terminated the Merger Agreement pursuant to the fiduciary out. In addition, separately from the Merger Agreement, Golden Gate and Signet entered into the Voting Agreement, which required Golden Gate to vote their shares in favor of the Merger.

## 8. The reaction of Zale's stockholders to the Merger's announcement

After the Proxy was filed on May 1, 2014, several large Zale stockholders spoke out against the Merger. In particular, on May 9, 2014, TIG Advisors, LLC ("TIG"), which then owned approximately 9.5% of Zale's outstanding shares, filed materials with

11

the SEC urging Zale's stockholders to vote against the Merger. In those materials, TIG stated that "shareholders are not being paid a fair value for the margin expansion opportunity they already own, much less a fair premium" and that the "sales process [was] replete with numerous conflicts of interest, particularly relating to Golden Gate Capital's involvement as well as that of [Merrill Lynch], doom[ing] shareholders [*sic*] chances for a fair outcome."[11] TIG also opposed the Merger on the grounds that: (1) the participation of Golden Gate's representatives in the Negotiation Committee created a conflict of interest between a stockholder looking to sell its stake—*i.e.*, Golden Gate— and the Board's obligation to maximize stockholder value; (2) Merrill Lynch's prior involvement with Signet tainted the entire sales process; (3) the financial projections relied on by the Board and Merrill Lynch in assessing the sale were stale and included "a lower alternative case" created by the Board "to justify the deal price"; (4) Signet's indication to Killion that it preferred that he remain as Zale's CEO post-Merger created a conflict of interest; (5) Zale's standalone prospects were more compelling than a Merger, given the success of their turnaround efforts; and (6) the synergies provided to Signet by the Merger were not being allocated equitably among the stockholders.[12]

On May 13, 2014, the Board responded to TIG's criticism by filing an investor presentation with the SEC. In that presentation, the Board urged stockholders to support the Merger by pointing out it represented "compelling and immediate value for

---

[11] *Id.* ¶ 87.

[12] *Id.*

12

shareholders."[13] The Board also stated that: (i) they had "evaluated the offer price relative to the risks, uncertainties and challenges in connection with executing the Company's three-year plan [which corresponded to the Business Plan Case Projections]"; (ii) achievement of the three-year plan would be "challenging" and entail "significant execution risk"; (iii) the "three-year plan was designed to challenge management and was aligned accordingly with the Company's board-approved long-term incentive plan"; and (iv) the Merger provided "certainty of value and eliminate[d] the risks of achieving the Company's three-year plan."[14]

Between May 15 and May 20, 2014, Zale and TIG publicly debated the merits of the Merger, largely reasserting their relative justifications and objections. During that period, GAMCO Investors, Inc. ("GAMCO"), an investment fund that, at the time, owned 7.42% of Zale's outstanding shares, announced that it also was considering voting against the Merger on the same bases as TIG and had "commenced the process to be able to assert appraisal rights."[15] In addition, Institutional Shareholder Services, Inc. ("ISS") and Glass, Lewis & Co., LLC ("Glass Lewis"), two proxy advisory services, entered the fray regarding the Merger on opposing sides. ISS aligned itself with the Board, recommending that all Zale stockholders vote in favor of the deal on the same bases asserted by the Board. Glass Lewis, on the other hand, agreed with TIG and

---

[13]     *Id.* ¶ 88.

[14]     *Id*.

[15]     *Id*. ¶ 90.

recommended that all Zale stockholders vote against the Merger "in favor of a more robust strategic review and – in the absence of a compelling alternative – the continued pursuit of Zale's stand-alone operating plan."[16]

### 9. Zale's stockholders vote to consummate the Merger

On May 29, 2014, the stockholder vote on the Merger took place, with 53.1% of Zale's stockholders approving the Merger. The next day, Zale announced completion of the Merger. Thereafter, a number of stockholders filed petitions seeking appraisal of their Zale shares in this Court under Section 262 of the Delaware General Corporation Law (the "DGCL").[17] On June 30, 2014, Zale filed a verified list of individuals and entities that purported to demand payment for their Zale shares pursuant to Section 262 of the DGCL and with whom no agreements as to the value of their shares had been reached. The list of 62 names included TIG and GAMCO.

### C. Procedural History

Shortly after the February 19, 2014 announcement of the Merger, each of the five Plaintiffs filed complaints seeking to enjoin the Merger. On March 25, 2014, those actions were consolidated, and on April 23, 2014, Plaintiffs filed a consolidated amended complaint along with motions for a preliminary injunction to enjoin consummation of the Merger and for expedited proceedings. The parties then engaged in expedited discovery, during which Zale produced board minutes and materials and Plaintiffs deposed Burman

---

[16] *Id.* ¶ 98.

[17] 8 *Del. C.* § 262.

and Rose.  On May 23, 2014, after the parties had briefed the motion for preliminary injunction, I heard argument on that motion and delivered an oral ruling denying the preliminary injunction.

On September 30, 2014, four months after the Merger was consummated, Plaintiffs filed the Complaint, which they had amended to include a claim against Merrill Lynch for aiding and abetting the Director Defendants' breaches of fiduciary duties as well as additional allegations based on discovery taken during the preliminary injunction stage.  Soon after Plaintiffs filed the Complaint, each of the three groups of Defendants separately moved to dismiss under Rule 12(b)(6) based on Plaintiffs' alleged failure to state a claim upon which relief could be granted.  The parties then briefed those motions, and I heard argument on May 20, 2015.  This Memorandum Opinion contains my rulings on Defendants' motions to dismiss.

### D.     Parties' Contentions

Count I of the Complaint alleges that the Director Defendants breached their fiduciary duties of loyalty and care to Plaintiffs.  Specifically, Plaintiffs allege that the Director Defendants acted to "put their personal interests ahead of [Zale and its stockholders]" and "failed to act reasonably in good faith and on a fully informed basis," depriving Plaintiffs of the ability to obtain the true value of their investment in Zale.[18]  Defendants counter that Plaintiffs' claims fail because: (1) Zale has an exculpation provision in its charter that requires Plaintiffs' duty of care claims be dismissed; (2) no

---

[18]     Compl. ¶¶ 125-126.

duty of loyalty violation is alleged because Plaintiffs only claim that up to four of the nine Director Defendants were conflicted as to the Merger, meaning that a majority were independent and disinterested; and (3) none of the alleged "flaws" in the sale process rise to the level of bad faith.

Count II charges Signet with aiding and abetting the Director Defendants' breaches of fiduciary duties on the grounds that "Signet was an active and knowing participant in the Individual [Directors'] breaches of fiduciary duties."[19] Plaintiffs also claim that Signet, with the knowledge that the Director Defendants were failing to seek the best price for Zale's stockholders, offered an inadequate price for their own benefit. Defendants respond by reiterating that Plaintiffs failed to allege any cognizable claims against the Director Defendants and, therefore, there were no underlying fiduciary duty breaches for Signet to aid and abet. Defendants also argue that, even if the Director Defendants did breach their fiduciary duties, Plaintiffs' aiding and abetting claims are meritless because none of the facts alleged support a reasonable inference that Signet "knowingly participated" in any such breaches.

Finally, in Count III, Plaintiffs allege that Merrill Lynch also aided and abetted the Director Defendants' breaches of fiduciary duties. According to the Complaint, "Merrill Lynch, for improper motives of its own, intentionally created an unreasonable sale process."[20] In particular, the Complaint alleges that Merrill Lynch undermined the

---

[19]     *Id.* ¶ 133.

[20]     *Id.* ¶ 141.

16

Board's ability to maximize stockholder value in the Merger by making a presentation to Signet "with an illustrative price analysis of Zale" at a time when Merrill Lynch had access to Zale's non-public information.[21] Defendants oppose these claims on numerous grounds, emphasizing that Plaintiffs failed to allege both underlying fiduciary duty breaches by the Director Defendants and, if there were underlying breaches, that Merrill Lynch was a knowing participant in those breaches. Further, Defendants argue that Merrill Lynch's presentation to Signet: (1) was in the ordinary course of business; (2) created no conflicts of interest between Merrill Lynch and Zale's stockholders; (3) did not involve any of Zale's non-public information; and (4) was disclosed to the Board and Zale's stockholders before the Merger was consummated.

I consider each of these Counts separately below, after first describing the standard of review I must apply on a motion to dismiss under Rule 12(b)(6).

## II. ANALYSIS

### A. Standard of Review

Pursuant to Court of Chancery Rule 12(b)(6), this Court may grant a motion to dismiss for failure to state a claim if a complaint does not assert sufficient facts that, if proven, would entitle the plaintiff to relief. "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[22] That is, when considering such a motion, a court must "accept all well-pleaded factual allegations in the

---

[21] *Id.*

[22] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011) (footnote omitted).

17

Complaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[23] This reasonable "conceivability" standard asks whether there is a "possibility" of recovery.[24] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[25] Moreover, failure to plead an element of a claim precludes entitlement to relief, and, therefore, is grounds to dismiss that claim.[26]

Generally, the court will consider only the pleadings on a motion to dismiss under Rule 12(b)(6). "A judge may consider documents outside of the pleadings only when: (1) the document is integral to a plaintiff's claim and incorporated in the complaint or (2) the document is not being relied upon to prove the truth of its contents."[27]

## B. Count I – Breach of Fiduciary Duties Against the Director Defendants

### 1. Plaintiffs' *Revlon* claims against the Director Defendants

The Complaint alleges that the Director Defendants breached their fiduciary duties because: (1) the Board was not disinterested or independent as to the Merger; (2) the Board's actions during the Merger process constituted bad faith; and (3) even if the

---

[23]     *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002)).

[24]     *Id.* at 537 & n.13.

[25]     *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[26]     *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 972 (Del. Ch. 2000) (Steele, V.C., by designation).

[27]     *Allen v. Encore Energy P'rs*, 72 A.3d 93, 96 n.2 (Del. 2013).

Board's actions during the Merger process did not rise to the level of bad faith, they still constituted breaches of the duty of care.

In terms of the legal standard under which I should review Plaintiffs' claims, Defendants argue that the business judgment rule, rather than *Revlon* enhanced scrutiny, applies in this case. According to Defendants, I should extend the reasoning in *In re KKR Financial Holdings LLC Shareholder Litigation*[28] and hold that "[t]he business judgment standard of review applies to mergers 'approved by a majority of the shares held by disinterested stockholders . . . in a vote that was fully informed.'"[29] In *KKR*, Chancellor Bouchard held that although the entire fairness standard of review generally would apply to a merger where a majority of the corporation's directors were not independent, the business judgment rule applies, instead, when the merger is approved by a majority vote of disinterested, fully informed stockholders, even if that vote is statutorily required as opposed to voluntarily sought by the directors.[30] Chancellor Bouchard also addressed the potential conflict between his decision and the Supreme Court's decision in *Gantler v. Stephens*[31]:

> In light of the Delaware Supreme Court's 2009 decision in *Gantler v. Stephens,* there has been some debate as to whether the standard [that a fully informed vote by disinterested shareholders changes the standard of review

---

[28]  101 A.3d 980 (Del. Ch. 2014), *appeal pending*, No. 629, 2014.

[29]  Signet and Zale Defs.' Opening Br. 32 (quoting *KKR*, 101 A.3d at 1003).

[30]  *KKR*, 101 A.3d at 1001.

[31]  965 A.2d 695 (Del. 2009).

19

from entire fairness to business judgment rule] articulated in *Wheelabrator, Harbor Finance* and other decisions remains good law when the stockholder vote is statutorily required as opposed to a purely voluntary stockholder vote. . . . I do not read *Gantler* to have altered the legal effect of a stockholder vote when it is statutorily required. Instead, I read it simply to clarify the meaning of the term "ratification."

. . . Justice Jacobs, writing for the Court, quoted at length from his Court of Chancery decision in *Wheelabrator* to explain that the "scope and effect of the common law doctrine of shareholder ratification is unclear." He then wrote that, "[t]o restore coherence and clarity to this area of our law, we hold that the scope of the shareholder ratification doctrine must be limited to its so-called 'classic' form; that is, to circumstances where a fully informed shareholder vote approves director action that does *not* legally require shareholder approval in order to become legally effective." The Court further explained that "the only director action or conduct that can be ratified is that which the shareholders are specifically asked to approve."

The Supreme Court in *Gantler* did not expressly address the legal effect of a fully informed stockholder vote when the vote is statutorily required. Having determined that the proxy disclosures were materially misleading, the Supreme Court did not need to reach that question.

. . . I read the Supreme Court's discussion of the doctrine of ratification in *Gantler* to have been intended simply to clarify that the term "ratification" applies only to a voluntary stockholder vote.[32]

Vice Chancellor Laster has advocated the same position as was adopted in *KKR*, using similar reasoning, in the context of cases involving enhanced scrutiny, including *Revlon*

---

[32]   *KKR*, 101 A.3d at 1001-03.

cases.[33]  The *KKR* decision has been appealed, and the Supreme Court heard argument on September 16.

### a.  Was there a majority disinterested and fully informed vote of stockholders in this case?

In order for the standard of review in this case to be shifted from enhanced scrutiny to the business judgment rule under *KKR*, the Merger must have been approved by a disinterested majority of Zale's stockholders in a fully informed vote.

### i.  A disinterested majority of Zale's stockholders approved the Merger

In assessing whether a majority of Zale's stockholders were disinterested, I note that Golden Gate—the owner of 23.3% of Zale's common stock—is the only significant stockholder as to whom the Complaint alleges any conflict.  Plaintiffs dedicate considerable attention to their argument that Golden Gate received unique, material benefits in the form of liquidity.  They also point to the loan prepayment fee as a source of conflict.  Neither alleged conflict is controversial, from my perspective.

Although Plaintiffs allege that Golden Gate stood to earn $3.2 million on the prepayment fee on their $150 million loan to Zale,[34] they fail to make any allegations as to whether $3.2 million is material to Golden Gate.[35]  That conclusion is not obvious in the case of a private equity firm like Golden Gate, especially when its 23.3% ownership

---

[33]   J. Travis Laster, *The Effect of Stockholder Approval on Enhanced Scrutiny*, 40 WM. MITCHELL L. REV. 1443 (2014).

[34]   Compl. ¶ 48 n.1.

[35]   *See infra* note 68 and accompanying text.

stake in Zale had a value of approximately $225 million at the Merger Price of $21 per share. Further, to the extent that Plaintiffs are asserting that Golden Gate had a unique need for liquidity such that it would benefit from receiving the Merger consideration differently than Zale's other stockholders, I do not find that argument persuasive. The Complaint only makes conclusory allegations regarding Golden Gate's desire to exit its position in Zale, relying primarily on the Secondary Offering as evidence of such. Plaintiffs never allege *why* Golden Gate needed to liquidate its shares or that it had an exigent need for liquidity.

Although there are cases in which a plaintiff's allegations of a large stockholder's need for liquidity have been sufficient to defeat a motion to dismiss, the plaintiffs in those cases alleged much more specific liquidity needs than a simple desire to "sell quickly."[36] Those cases are further distinguishable because the stockholder allegedly in need of liquidity here, Golden Gate, had another avenue, aside from the Merger, to satisfy that

---

[36] *See McMullin v. Beran*, 765 A.2d 910, 921 (Del. 2000) ("[Plaintiff's complaint] alleges that [the controlling stockholder] initiated and timed the Transaction to benefit itself because [the controlling stockholder] needed cash to fund [a] $3.3 billion cash acquisition."); *In re Answers Corp. S'holder Litig.*, 2012 WL 1253072, at *4 (Del. Ch. Apr. 11, 2012) ("[A]ccording to the Plaintiffs . . . the only way that [the stockholder seeking liquidity could monetize its investment] was if [the company] engaged in a change of control transaction; [the company's] common stock was so thinly traded that [the stockholder] could not sell its entire 30% equity interest in the public market."); *N.J. Carpenters Pension Fund v. infoGROUP, Inc.*, 2011 WL 4825888, at *9 (Del. Ch. Oct. 6, 2011) ("As alleged by the Plaintiff, [the interested stockholder's] need for liquidity arose from a confluence of factors" including a need for "$12 million under the SEC and derivative settlements, and over $13 million related to loans used to buy [company] shares.").

need: the Secondary Offering. Because the Complaint fails to allege that Golden Gate or any other significant stockholder was interested as to the Merger, I conclude that a disinterested majority of Zale's stockholders—53.1%—approved the Merger.

### ii.    The vote on the Merger was fully informed

Regarding whether the vote on the Merger was fully informed, Plaintiffs allege that the Director Defendants omitted material information from the Proxy. In particular, Plaintiffs argue that the Director Defendants "breached their duty to disclose: (i) that the Board's own financial advisor determined that the Company was more valuable as a standalone entity; and (ii) material information concerning the Company's financial projections."[37] Plaintiffs' first argument refers to the fact that the Summary Valuation of Strategic Alternatives that Merrill Lynch presented to the Board on November 18, 2013 was not included in the Proxy. Their second argument pertains to the allegations in the Complaint that the Board mischaracterized Zale's management's Business Plan Case Projections in the Proxy.

I first address Defendants' argument that Plaintiffs' duty of disclosure claims fail as a matter of law. Defendants assert that because "Plaintiffs have rehashed their prior allegations" made on their motion for a preliminary injunction and because I rejected those allegations when I denied the preliminary injunction, Plaintiffs are barred from prosecuting those claims further at this stage of the litigation.[38] I disagree. Because

---

[37]    Pls.' Answer Br. 49-50.

[38]    Signet and Zale Defs.' Opening Br. 27-29.

23

"[t]he pleadings stage test standard is lower than the merits-focused element of the preliminary injunction standard,"[39] Plaintiffs are not barred as a matter of law from pursuing claims now that failed at the preliminary injunction stage. That said, I conclude that Plaintiffs still have not pled successfully any of their duty of disclosure claims such that I could conclude reasonably that the stockholder vote on the Merger was not fully informed.

Although those claims are not barred as a matter of law by my ruling at the preliminary injunction stage, I conclude, using the same reasoning I did at that stage and considering both the Complaint and the Proxy, that Plaintiffs fail to allege adequately that the exclusion of the Summary Valuation of Strategic Alternatives from the Proxy and the Board's alleged mischaracterizations of the Business Plan Case Projections were material. In both cases, significant information was disclosed in the Proxy. Thus, I do not find it reasonably conceivable that the Proxy was materially deficient or that Zale's stockholder vote was not fully informed.

### b. Effect of *KKR*

Under *KKR*, the legal effect of a fully informed vote by a majority of Zale's disinterested stockholders is that the "the business judgment rule applies and insulates the [Merger] from all attacks other than on the grounds of waste." In this case, for reasons explained below, I would follow the reasoning articulated in *KKR* if it permitted a review

---

[39] *OTK Assocs., LLC v. Friedman*, 85 A.3d 696, 725 (Del. Ch. 2014).

of the Merger under the business judgment rule that included an analysis of whether the Director Defendants breached their duty of care by committing gross negligence.

For purposes of Defendants' motion to dismiss, I would reach the same conclusion as to all Defendants, except Merrill Lynch, whether I followed the holding in *KKR* and held that the fully informed vote of a disinterested majority of the Zale stockholders in favor of the Merger had the effect of subjecting Plaintiffs' claims to business judgment rule review or determined that *Gantler* required continued use of enhanced scrutiny in these circumstances. In the latter case, however, where no cleansing effect is given to the stockholder vote, I would find that Plaintiffs conceivably could prove their claim that Merrill Lynch is liable for aiding and abetting a breach of the Director Defendants' duty of care.

There appear to be good arguments both for and against the approach adopted in *KKR*. As I pointed out above, Chancellor Bouchard and Vice Chancellor Laster make a strong case for interpreting *Gantler* simply as clarifying the definition of "ratification." On the other hand, opponents of that view contend that "[p]ermitting the vote of a majority of stockholders on a merger to remove from judicial scrutiny unilateral Board action in a contest for corporate control would frustrate the purposes underlying *Revlon*"[40] and would disturb the settled understanding of the Supreme Court's

---

[40] *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 68 (Del. 1995). *But see In re Lukens Inc. S'holders Litig.*, 757 A.2d 720, 736-38 (Del. Ch. 1999) (holding that business judgment rule applies rather than *Revlon* enhanced scrutiny when a merger is approved by a fully informed majority of disinterested stockholders), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (Del. 2000).

decision in *Gantler*.[41]  Because this area of Delaware law is unsettled, I will conduct my analysis under a more strict reading of *Gantler*.  Until the Supreme Court signals otherwise, I interpret *Gantler* as holding that an enhanced standard of review cannot be pared down to the business judgment rule as a result of a statutorily required stockholder vote, even one rendered by a fully informed, disinterested majority of stockholders.  As a result, I conclude that where, as here, the merger consideration paid to the target company's stockholders is cash, *Revlon* enhanced scrutiny applies, even after the merger has been approved by a fully informed, disinterested majority of stockholders.[42]  Thus, after describing the legal standard applicable in a *Revlon* case, I effectively apply that standard to each of Plaintiffs' claims against the Director Defendants in the context of concluding that each claim must be dismissed under Rule 12(b)(6).

### c.  *Revlon* standard of review

Corporate directors have "an unyielding fiduciary duty to protect the interests of the corporation and to act in the best interests of its shareholders."[43]  When directors have commenced a transaction process that will result in a change of control, a reviewing court will examine whether the board has reasonably performed its fiduciary duties "in the

---

[41]  *See, e.g.*, *Calma on Behalf of Citrix Sys., Inc. v. Templeton*, 114 A.3d 563, 586 (Del. Ch. 2015); *Gentili v. L.O.M. Med. Int'l, Inc.*, 2012 WL 3552685, at *3 (Del. Ch. Aug. 17, 2012); *see also Santa Fe*, 669 A.2d at 68.

[42]  *See TW Servs., Inc. v. SWT Acq. Corp.,* 1989 WL 20290, at *7 (Del. Ch. 1989) (Allen, C.).

[43]  *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 360 (Del. 1993) (citations omitted).

service of a specific objective: maximizing the sale price of the enterprise."[44] So-called *Revlon* duties are only specific applications of directors' traditional fiduciary duties of care and loyalty in the context of control transactions.[45]

While the intermediate level of *Revlon* enhanced scrutiny is "more exacting than the deferential rationality standard applicable to run-of-the-mill decisions governed by the business judgment rule, at bottom *Revlon* is a test of reasonableness; directors are generally free to select the path to value maximization, so long as they choose a reasonable route to get there."[46] In that regard, the questions before me are: (1) whether the decision making process employed by the Director Defendants, including the information on which they based their decisions, was adequate; and (2) whether the Director Defendants' actions were reasonable in light of the circumstances then existing.[47] Thus, enhanced scrutiny under *Revlon* has both subjective and objective components. Even though there is an objective reasonableness evaluation, however,

---

[44]  *Malpiede v. Townson,* 780 A.2d 1075, 1083 (Del. 2001) (citing, among other cases, *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.,* 506 A.2d 173, 182–83 (Del. 1986)).

[45]  *Wayne Cty. Empls.' Ret. Sys. v. Corti,* 2009 WL 2219260, at *10 (Del. Ch. July 24, 2009) (citing *McMillan v. Intercargo Corp.,* 768 A.2d 492, 502 (Del. Ch. 2000)), *aff'd,* 966 A.2d 795 (Del. 2010) (TABLE).

[46]  *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 595-96 (Del. Ch. 2010).

[47]  *Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 (Del. 1994).

*Revlon* "is not a license for law-trained courts to second-guess reasonable, but debatable, tactical choices that directors have made in good faith."[48]

### d. Plaintiffs' *Revlon* claims

At a practical level in the circumstances of this case, there is a great deal of overlap between the analysis of the Director Defendants' conduct in terms, first, of their *Revlon* duties and, second, of their potential rights to exculpation from a damages claim under Zale's charter. Even assuming that there was a problem with the Board's Merger process or actions under the *Revlon* standard of review, because Zale's charter contains an exculpatory provision pursuant to 8 *Del. C.* § 102(b)(7) (a "102(b)(7) provision"), there would be no basis to find the Director Defendants personally liable here absent a viable claim that they breached their duty of loyalty. In evaluating whether such a claim exists in determining the applicability of Zale's 102(b)(7) provision, however, I must consider many of the same facts that would be relevant in a reasonableness review under *Revlon*. Accordingly, I effectively assume the existence of a potential problem under *Revlon* and otherwise confine my analysis of the facts relevant to that issue to the discussion below regarding the applicability of Zale's 102(b)(7) provision.

### e. The legal effect of Zale's 102(b)(7) provision

If a corporation's charter contains a 102(b)(7) provision barring claims for monetary liability against directors for breaches of the duty of care, the complaint must

---

[48]     *See In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 830 (Del. Ch. 2011).

28

state a nonexculpated claim—*i.e.,* a claim predicated on a breach of the directors' duty of loyalty, including bad faith conduct.[49]

A factual showing that, for example, a majority of the board of directors was not both disinterested and independent would provide sufficient support for a claim for breach of the duty of loyalty to survive a motion to dismiss.[50] "A director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders."[51] "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences,"[52] such as where one director effectively controls another.[53] Moreover, as to any Director Defendant, the disqualifying self-interest or lack of independence must be material, *i.e.,* "reasonably likely to affect the decision-making process of a reasonable person . . . ."[54]

---

[49]     *See Lyondell Chem. Co. v. Ryan,* 970 A.2d 235, 239–40 (Del. 2009); *Corti,* 2009 WL 2219260, at *10.

[50]     *In re NYMEX S'holder Litig.,* 2009 WL 3206051, at *6 (Del. Ch. Sept. 30, 2009) (citing *In re Lukens S'holders Litig.,* 757 A .2d 720, 728 (Del. Ch. 1999)).

[51]     *Rales v. Blasband,* 634 A.2d 927, 936 (Del. 1993) (citing *Aronson v. Lewis,* 473 A.2d 805, 812 (Del. 1984)).

[52]     *Aronson,* 473 A.2d at 816.

[53]     *Orman v. Cullman,* 794 A.2d 5, 24 (Del. Ch. 2002).

[54]     *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 363 (Del. 1993).

29

Well-pled allegations that the board did not act in good faith also would state a claim for breach of the duty of loyalty sufficient to survive a motion to dismiss.[55] In general, "bad faith will be found if a 'fiduciary intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his duties.'"[56] Alternatively, notwithstanding approval by a majority of disinterested and independent directors, a claim for breach of duty may exist "where the decision under attack is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[57]

Because Zale adopted a 102(b)(7) provision,[58] Plaintiffs' monetary claims for breach of the duty of care against the Director Defendants must be dismissed. Plaintiffs' fiduciary duty claims against the Director Defendants can only circumvent Zale's 102(b)(7) provision and survive a motion to dismiss if the Complaint alleges facts sufficient to support a reasonable inference of a breach of the duty of loyalty, including that the Director Defendants acted in bad faith. I still will analyze whether the Director Defendants breached their duty of care, however, because such a breach could serve as a

---

[55]   *In re NYMEX S'holder Litig.,* 2009 WL 3206051, at *6 (footnote omitted).

[56]   *Lyondell Chem. Co.,* 970 A.2d at 243 (quoting *In re Walt Disney Co. Deriv. Litig.,* 906 A.2d 27, 67 (Del. 2006)).

[57]   *Crescent/Mach I P'rs, L.P.,* 846 A.2d at 981 (quoting *Parnes v. Bally Entm't Corp.,* 722 A.2d 1243, 1247 (Del. 1999)).

[58]   Aronstam Aff., *supra* note 3, Ex. D, art. Seventh, subsec. a.

30

predicate for liability under the aiding and abetting claims against Signet and Merrill Lynch.

### f. Plaintiffs fail to allege that the Board was conflicted regarding the Merger

As an initial matter, Plaintiffs' failure to allege any facts from which I reasonably could infer that a majority of the Board was either conflicted regarding the Merger or dominated by other, conflicted directors severely undermines Plaintiffs' claims that the Director Defendants breached their duty of loyalty.[59] Although the Complaint alleges that Attenborough, Olshansky, Killion, and Burman were conflicted, it is silent as to the other five directors. As stated *supra*, a director is conflicted regarding a transaction "where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders."[60] According to Plaintiffs, Golden Gate stood to receive material benefits from the Merger, in the form of needed liquidity and a loan prepayment fee, that the other stockholders would not receive. Burman and Killion both had restricted stock rights that would vest early as a result of the Merger. Killion, the only Zale employee on the Board, was promised future employment by Signet. Yet, even assuming that those are all unique, material benefits such that I can conclude that those four directors are conflicted, the Complaint does not allege anything regarding interestedness or lack of independence on the part of Defendants Braverman, Dyer,

---

[59] Absent sufficient allegations regarding the Board's disinterestedness and independence, Plaintiffs can only plead a breach of the duty of loyalty by successfully alleging that the Director Defendants acted in bad faith. I take up those claims in Section II.B.1.g. *infra*.

[60] *Rales,* 634 A.2d at 936.

31

Gilman, Lowe, or Pritchard. Thus, I find that a majority of the Board was independent and disinterested.

The Complaint also fails to present any facts that would support a reasonable inference that one or more of the four allegedly conflicted directors dominated the other five directors.[61] At most, Plaintiffs contend that the conflicted directors controlled the sale process because: (1) Attenborough and Olshansky recruited Burman to serve as Zale's chairman; (2) Signet initially approached Zale about a merger through Olshansky; and (3) Olshansky and Burman served on the Negotiating Committee. As stated in *In re OPENLANE, Inc. Shareholder Litigation*, however, even if a conflicted director participates in a sale process, that process is not tainted if the Board is aware of such a conflict and "fully committed to the [sale] process."[62] Plaintiffs *do not* allege that the Board ever delegated any of its ultimate authority to the Negotiating Committee, but they *do* admit that the Board knew about all of the relevant conflicts, as they were discussed openly during the Board's meeting on November 18, 2013. Thus, I find that the majority independent, disinterested Board was fully informed and retained final say on all major aspects of the sale process despite the participation of potentially conflicted directors.

Finally, I am skeptical as to whether any of the conflicts that Plaintiffs allege tainted Attenborough, Olshansky, and Burman even rise to such a level that they should

---

[61] *See In re Alloy, Inc. S'holder Litig.*, 2011 WL 4863716, at *8-9 (Del. Ch. Oct. 13, 2011) ("Absent specific allegations of actual control, the facts Plaintiffs allege cannot support a reasonable inference that [the Company's] seven outside directors lacked independence.").

[62] 2011 WL 4599662, at *5 (Del. Ch. Sept. 30, 2011).

32

be considered interested or not independent under Delaware law.[63]  As I concluded *supra*, the Complaint fails to allege adequately that Golden Gate was interested as to the Merger. Thus, even assuming that Attenborough and Olshansky were beholden to Golden Gate, as its employees and representatives on the Board, rather than to Zale's stockholders as a whole, Plaintiffs have not alleged sufficient facts regarding Golden Gate's conflict to support a reasonable inference that Attenborough and Olshansky are not disinterested and independent.  On the contrary, because of its significant stake in Zale, Golden Gate likely had as much of an incentive to maximize the value of its investment as any stockholder, rather than take a price cut for the sake of liquidity.[64]

Regarding the early vesting of Burman's restricted common stock, I note that, in a related context, this Court has observed that "the accelerating of stock options is a routine aspect of merger agreements."[65]  Although Plaintiffs argue that "the accelerated vesting

---

[63]  Given the Complaint's allegation that Killion stood to earn nearly twice as much as the head of the Zale division within Signet as he did as Zale's CEO, Compl. ¶ 11, I conclude that it is reasonably conceivable that he was interested regarding the Merger.  Even though the Complaint does not specifically allege that this additional salary was material to Killion, I find it at least conceivable that the doubling of an individual's salary is "reasonably likely to affect the decision-making process of a reasonable person."  *In re Alloy, Inc. S'holder Litig.*, 2011 WL 4863716, at *7 (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 363 (Del. 1993).

[64]  *See C & J Energy Servs. Inc. v. City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Trust*, 107 A.3d 1049, 1069 n.92 (Del. 2014) (quoting *Iroquois Master Fund Ltd. v. Answers Corp.*, 2014 WL 7010777, at *1 n.1 (Del. Dec. 4, 2014) (ORDER)); *In re Morton's Rest., Inc. S'holders Litig.*, 74 A.3d 656, 666-69 (Del. Ch. 2013).

[65]  *OPENLANE*, 2011 WL 4599662, at *5.

33

of options and restricted stock [can create] a clear conflict"[66] between directors and stockholders who are opposed to a merger, the case they cite for that proposition, *Globis Partners, L.P. v. Plumtree Software, Inc.*, also states that "[t]he accelerated vesting of options does not create a conflict of interest because the interests of the shareholders and directors are aligned in obtaining the highest price."[67] As *Globis Partners* and other relevant cases establish, an essential consideration in any conflict inquiry is the relative materiality of the alleged conflict.[68] And, as to each of Defendants Attenborough, Olshansky, and Burman's, the Complaint contains no allegations regarding the relative materiality of those unique benefits to those Director Defendants. As such, I have no reference point by which to measure each conflict's comparative impact on the Director Defendants' impartiality.

In sum, Plaintiffs do not allege any conflicts whatsoever regarding five of the nine Director Defendants. Plaintiffs do not allege facts that would allow me to infer that any of the four allegedly conflicted Director Defendants dominated the other five. And, with

---

[66]   Pls.' Answer Br. 42.

[67]   2007 WL 4292024, at *8 (Del. Ch. Nov. 30, 2007).

[68]   *See Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 650 (Del. 2014) ("[T]he plaintiffs have ignored a key teaching of our Supreme Court, requiring a showing that a specific director's independence is compromised by factors material to her. As to each of the specific directors the plaintiffs challenge, the plaintiffs fail to proffer any real evidence of their economic circumstances." (quoting *In re MFW S'holders Litig.*, 67 A.3d 496 (Del. Ch. 2013))); *Cede & Co.*, 634 A.2d at 362-63 (affirming that a stockholder must demonstrate the materiality of a self-interest to a director's independence); *Globis P'rs*, 2007 WL 4292024, at *9 (noting that the plaintiff's claim that a director acted out of self-interest must fail because no facts regarding the relative materiality of the conflict were pled).

34

the possible exception of Killion, I am skeptical whether Plaintiffs have demonstrated that the four Director Defendants that Plaintiffs claim are not disinterested and independent have conflicts rising to a level that would disqualify them under Delaware law. Because the Complaint does not allege sufficient facts for me to infer that a majority of the Director Defendants were not disinterested and independent or were dominated by conflicted Director Defendants, I conclude that Plaintiffs have failed to state a claim for breach of the duty of loyalty,[69] unless they have alleged sufficiently that the Director Defendants acted in bad faith.

### g.      Plaintiffs fail to allege that the Director Defendants acted in bad faith during the Merger process

In addition to attacking the disinterestedness and independence of the Director Defendants, Plaintiffs assert a variety of *Revlon* claims targeted at the allegedly flawed sale process. To prevail on those claims for damages against the Director Defendants, however, Plaintiffs must demonstrate not just that the Director Defendants breached their duty of care, but that their actions rose to the level of bad faith. In the *Revlon* context, as stated above, bad faith can be demonstrated by a director's "conscious disregard for his duties"[70] or a decision by a majority disinterested, independent board that "is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any

---

[69]    *NYMEX,* 2009 WL 3206051, at *6 ("In order to state a claim for breach of the duty of loyalty, the Plaintiffs must plead facts from which this Court can reasonably infer that either: 'a majority of the Director Defendants either stood on both sides of the merger or were dominated and controlled by someone who did . . . .'").

[70]    *Lyondell Chem. Co.*, 970 A.2d at 243.

35

ground other than bad faith."[71]  I address next Plaintiffs' primary criticisms of the Merger and conclude that none of the alleged actions taken by the Director Defendants are sufficient to support a claim of bad faith.

### i.      The Board undervalued Zale's stock

Plaintiffs' first contention is that "Zale was undervalued at the time the Merger was announced due to the overhang created by the [Preliminary] Registration Statement."[72]  Because this claim is inextricably linked to Plaintiffs' argument regarding Golden Gate's desire for liquidity, I largely will address it in that context *infra*.  I pause here briefly to comment on Plaintiffs' assertion that the Director Defendants, armed with the knowledge that Zale was undervalued due to the Preliminary Registration Statement, "received three offers from Signet, but did not counter a single one."[73]  That statement is puzzling because, in the next sentence of their brief, Plaintiffs admit that "the Board determined after the second offer [of $20.50 per share, partly in Signet stock] that it would allow Signet to engage in due diligence and then determined to close the negotiations if Signet would increase its offer to $21.00."[74]  Because the Board countered one of Signet's offers by requesting an additional $0.50 per share in consideration, I find

---

[71]     *Crescent/Mach I P'rs, L.P,* 846 A.2d at 981.

[72]     Pls.' Answer Br. 37.

[73]     *Id*. at 38.

[74]     *Id*.

unpersuasive Plaintiffs' contention that the Director Defendants acted in bad faith in this regard.

### ii.  The Board favored Signet in the Merger process

Next, Plaintiffs argue that "the Individual [Directors] catered the process to Signet to ensure that they received significant personal benefits."[75]  In particular, Plaintiffs point out that the Board never performed a market check, did not adequately consider strategic alternatives, and rebuffed an unsolicited indication of interest from Gitanjali.  Plaintiffs contend that the Board avoided a market check in favor of a deal that would result in "significant personal benefits."  But, the Complaint's allegations do not support this theory because the only Signet-specific benefit that Plaintiffs claim the Director Defendants received was Killion's promise of future employment.  Other than that, every benefit that Plaintiffs allege the Director Defendants were seeking would have accrued in the event of any merger, not just a merger with Signet.

Further, because Plaintiffs' allegations of self-interested motivations fail, they must allege that the Director Defendants consciously disregarded their duties by not conducting a market check.[76]  That was not the case here.  Over the course of at least

---

[75]  *Id*. at 44.

[76]  As Defendants point out in their brief, Plaintiffs incorrectly quote this Court's opinion in *Ryan v. Lyondell Chem. Co.*, 2008 WL 2923427, at *19 (Del. Ch. July 29, 2008), *rev'd*, 970 A.2d 235 (Del. 2009), for the proposition that directors "must confirm that they have obtained the best available price either by conducting an auction, by conducting a market check, or by demonstrating an impeccable knowledge of the market."  Pls.' Answer Br. 44.  In fact, that portion of *Lyondell* was overruled by the Delaware Supreme Court, which clarified that

37

three meetings, the Board discussed the possibility of performing a market check.[77] After considering this possibility, the Board decided, in consultation with Merrill Lynch and Cravath on February 6, 2014, not to perform a market check due to the risk of leaks regarding their negotiations with Signet. The Board weighed the risks that such leaks would compromise their deal with Signet against the improbability of a more favorable offer arising.[78] Because the Board specifically considered pursuing a market check and rejected that option based on their assessment of likely alternative opportunities, it cannot be said that they acted in bad faith.

In addition to arguing that the Board inadequately considered transactions with other potential buyers, Plaintiffs also claim that the Board improperly was committed to engaging in a merger rather than having Zale continue as a standalone company. This argument appears to rest on the merger-related benefits that Plaintiffs allege the purportedly interested and non-independent Director Defendants sought. Even if I had not already concluded that the majority of the Director Defendants' interests were aligned with the rest of Zale's stockholders, Plaintiffs' claims that the Director Defendants acted in bad faith in this regard still would fail. As admitted in the Complaint, Merrill Lynch

---

bad faith only can be found in the *Revlon* context if disinterested, independent "directors utterly failed to attempt to obtain the best sale price." *Lyondell*, 970 A.2d at 244.

[77] According to the Proxy, the Board discussed the possibility of alternative transactions with other strategic buyers during meetings on December 5, 2013, January 23, 2014, and February 6, 2014. *See* Aronstam Aff., *supra* note 3, Ex. A [hereinafter Proxy], at 26-28.

[78] *See* Proxy, *supra* note 77, at 28.

presented the Summary Valuation of Strategic Alternatives to the Board on November 18, 2013.[79] This presentation included six different alternatives, including maintaining the status quo—*i.e.*, remaining a standalone company rather than entering into a merger—as well as Zale's projected valuation ranges under both a base case and an upside case for each alternative. Thus, Plaintiffs' claim that the Director Defendants acted in bad faith by failing to consider adequately non-merger strategic alternatives is contradicted by their own Complaint.

Regarding the indication of interest from Gitanjali, the Complaint itself states that the Board, rather than "rebuffing" the indication as Plaintiffs have asserted throughout their brief,[80] simply "determined that it would not allow Gitanjali to proceed with exploratory due diligence without an initial indication of price and an indication of available financing."[81] This does not support Plaintiffs' charge that the Board "tilted the process in favor of Signet." Rather, because the Board had received an initial price, as well as a second revised price, from Signet before it allowed them to conduct due diligence, Plaintiffs allegations suggest no more than that the Board required a comparable indication of interest from Gitanjali.

---

[79] Compl. ¶¶ 63-64.

[80] Pls.' Answer Br. 18, 26, 43, 44.

[81] Compl. ¶ 71.

### iii. The Board agreed to an unreasonable Merger Price

Plaintiffs expend much energy attacking the reasonableness of the Merger Price. For this challenge to support a claim that the Director Defendants acted in bad faith, however, Plaintiffs must demonstrate that the Merger Price "is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith."[82] Plaintiffs rely on a number of their allegations to support this argument, including: (1) TIG's, GAMCO's, and Glass Lewis's oppositions to the Merger; (2) the valuation ranges in Merrill Lynch's Summary Valuation of Strategic Alternatives; (3) and Zale's management's Business Plan Case Projections. None of Plaintiffs' arguments are convincing.

First, to the extent that TIG's, GAMCO's, and Glass Lewis's oppositions to the Merger are evidence that the Merger Price was inadequate, Golden Gate's and ISS's support for the Merger are evidence of the Merger's fairness. Although I must draw all inferences in favor of Plaintiffs on Defendants' motion to dismiss, those inferences still must be reasonable. Because a large stockholder and an independent proxy advisory firm supported the Merger Price, I do not consider it reasonably conceivable that the opposition of the firms on which Plaintiffs rely would make that price "essentially inexplicable on any ground other than bad faith."[83]

---

[82] *Crescent/Mach I P'rs, L.P.,* 846 A.2d at 981 (quoting *Parnes,* 722 A.2d at 1247).

[83] *Id.*

Second, although Plaintiffs point out that each of the six alternatives in the Summary Valuation of Strategic Alternatives had a maximum valuation, in the upside case scenario, that exceeded the Merger Price, they ignore the fact that $21 per share Merger Price is still within the valuation range for each of those alternatives. In addition, $21 per share is higher than the maximum valuation for each of the six strategic alternatives under the base case scenario. Thus, the Summary Valuation of Strategic Alternatives that Plaintiffs emphasize indicates that the Merger Price *can* be explained on grounds other than bad faith.

Finally, the Complaint alleges that the "day before the Merger Agreement was announced . . . Zale was trading at an EV/EBITDA of 9.1x" and that "with the Business Plan Case Projections for fiscal year 2016 implies a $31.00 per share price."[84] As pointed out in the Complaint, the Board disputed the reliability of these projections during their debate with TIG regarding the Merger.[85] Because I must draw all reasonable inferences in Plaintiffs' favor, however, I infer that the Board originally did consider the projections to be reliable. That said, Plaintiffs do not dispute Defendants' argument that all projections inherently contain execution risk. Further, the Business Plan Case Projections on which Plaintiffs rely for the $31 implied price also formed the basis of the

---

[84] Comp. ¶ 107.

[85] The Complaint alleges that, during their debate with TIG, the Director Defendants attempted to recast the Business Plan Case Projections as "aggressive" and "stretch projections" that were meant to "challenge management," while they originally had described them as their "best estimates as to the future financial performance of Zale." *Id*. ¶ 111.

41

upside case valuation ranges in the Summary Valuation of Strategic Alternatives within which, as stated earlier, the Merger Price fell. Thus, despite Plaintiffs' numerous allegations regarding the inadequacy of the Merger Price, I conclude that those allegations are not sufficient to support an inference that it is so unreasonable as to warrant a finding of bad faith.

#### iv. The Board agreed to unreasonable deal protections

Plaintiffs further contend that the Board agreed to impermissible deal protections in bad faith. Specifically, Plaintiffs challenge the Board's decision to include "a no solicitation provision, matching rights, and a termination fee of $26.7 million"[86] and point out that Golden Gate, a 23.3% stockholder of Zale, signed an agreement binding it to vote in favor of the Merger. Hence, less than 27% of Zale's remaining stockholders needed to vote in favor of the Merger for it to be approved. Based on the deal protections and the voting agreement together, Plaintiffs assert that they "have more than adequately pleaded that the Board agreed to lock up the Merger on terms favorable to Signet that all but guaranteed Zale's stockholders would not receive the best price possible for their shares."[87] As I concluded *supra*, however, Plaintiffs have not adequately pled that Golden Gate was conflicted regarding the Merger.[88] Therefore, Golden Gate's interests presumably were aligned with all of the other Zale stockholders. As a result, I do not

---

[86]     Pls.' Answer Br. 47.

[87]     *Id*. at 48.

[88]     *See supra* text accompanying notes 34-36.

42

consider Golden Gate's voting agreement with Signet material for purposes of evaluating the deal protections. That leaves the no-solicitation provision, the matching rights, and the termination fee of $26.7 million, or approximately 2.75% of Zale's equity value.[89] A number of Delaware cases, however, have rejected similar, and even more stringent, collections of deal protection measures as a basis for a breach of fiduciary duty claim.[90] Although Plaintiffs attempt to distinguish these cases on the grounds that they involved target companies that were "in play for several months,"[91] they ignore the fact that the Zale Board was open to external offers prior to entering into the Merger Agreement as well, as demonstrated by their preliminary discussions with Gitanjali in January 2014. Further, the Board's successful inclusion of both a fiduciary out provision and a reverse termination fee twice as large as the termination fee[92]—as well as a three-month period between signing and closing during which time alternative buyers could have come

---

[89]     Proxy, *supra* note 77, at 32.

[90]     *See, e.g.*, *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at *8-9 (Del. Ch. June 30, 2014) (holding that the target board did not act in bad faith by agreeing to "(1) a no-solicitation provision; (2) a standstill provision; (3) a change in recommendation provision; (4) information rights for Cypress; and (5) a $5 million termination fee [that equaled 4.5% of the company's equity value"); *In re BJ's Wholesale Club, Inc. S'holders Litig.*, 2013 WL 396202, at *13 (Del. Ch. Jan. 31, 2013) (holding that the target board did not act in bad faith by agreeing to "a 'no-shop' provision, matching and information rights, a termination fee representing 3.1% of the deal value, and a 'force-the-vote' provision").

[91]     Compl. ¶ 48 n.22.

[92]     Proxy, *supra* note 77, at 32.

forward—are indicative of good faith negotiating on behalf of Zale's stockholders rather than bad faith.[93]

### v. The Board relied on a conflicted financial advisor

As to Merrill Lynch, Plaintiffs argue that the Board acted in bad faith by relying on a conflicted financial advisor's fairness opinion. The main source of Plaintiffs' criticism is Rose's involvement as a senior member of both the team that pitched a Zale merger to Signet in October 2013 and the team that later advised Zale on the Merger. According to Plaintiffs, because Merrill Lynch advised Signet's management that they should purchase Zale at a price between $17 and $21 per share, Merrill Lynch could not credibly have asked Signet to pay more than $21, which, coincidentally, ended up being the Merger Price. Although they admit that the Director Defendants did not learn of Merrill Lynch's conflict until after the Merger was announced, Plaintiffs contend that the Director Defendants acted in bad faith by not "seek[ing] the opinion of a non-conflicted financial advisor or to reduce Merrill Lynch's fees" once they found out about the conflict.[94] While the Director Defendants' response to Merrill Lynch's conflict, as well as their failure to detect the conflict sooner, might constitute a breach of the duty of care,[95] I conclude that Plaintiffs have not adequately pled that the Director Defendants

---

[93] *C & J Energy Servs. Inc.*, 107 A.3d at 1066 ("*Revlon* requires us to examine whether a board's overall course of action was reasonable as a good faith attempt to secure the highest value reasonably attainable.").

[94] Pls.' Answer Br. 47.

[95] I consider this issue in Section II.B.1.h *infra*.

44

acted in bad faith. Initially, the Board determined to consider engaging Merrill Lynch as a financial advisor "unless a conflict or other consideration affected the representation."[96] The Board also relied on Merrill Lynch's representation that it had "limited prior relationships and no conflicts" when they decided to hire them. Upon learning of Merrill Lynch's earlier presentation to Signet, the Board held three meetings, on March 25, March 30, and April 2, 2014, to review the situation and ultimately decided that "Merrill Lynch's presentation to Signet did not impact the Board's determination and recommendation regarding the merger, the merger agreement and the transactions contemplated thereby."[97] Making an inquiry initially to discover a financial advisor's conflicts, and later, upon being advised of a possible conflict, considering the implications of and remedies for that conflict as the Director Defendants did here, hardly constitutes the conscious disregard of the directors' duties required to demonstrate bad faith in the *Revlon* context.

### vi. The Board catered to Golden Gate's need for liquidity

Finally, I address Plaintiffs' somewhat speculative "liquidity" theory. First, they contend that Golden Gate was in need of liquidity. Next, rather than simply selling its shares in the Secondary Offering, as Golden Gate indicated was its intention via the Preliminary Registration Statement, Plaintiffs appear to hypothesize that Olshansky and Attenborough recruited Burman, Signet's former CEO, to join Zale in May 2013 for the

---

[96]     Compl. ¶ 62.

[97]     Proxy, *supra* note 77, at 30.

45

purpose of eventually effectuating a sale of Zale to Signet. In or around September 2013, Merrill Lynch was hired as lead underwriter for the Secondary Offering of Golden Gate's Zale stock. The related Preliminary Registration Statement was filed October 2. As Plaintiffs tell it, the purpose of the Secondary Offering was not to create an avenue by which Golden Gate could sell its 23.3% stake in Zale, but instead was to cap Zale's share price at an artificially low number around $15 per share in order to create the illusion of a premium upon Signet's offer. In other words, according to Plaintiffs, Golden Gate was worried that if Zale's stock price continued on its upward trend, it might make the Company too expensive for Signet to afford. Plaintiffs also suggest that this explains why Golden Gate never disclosed publicly its decision to withdraw the Secondary Offering, because if the public became aware that the Secondary Offering had been cancelled, Zale's stock price would have risen too high. And, in support of this theory, Plaintiffs cite to *McMullin v. Beran*,[98] *In re Answers Corp. Shareholder Litigation*,[99] and *N.J. Carpenters Pension Fund v. InfoGROUP, Inc.*[100] to demonstrate that Delaware courts have found allegations of similar schemes adequate to defeat a motion to dismiss.

I am convinced, however, that a number of crucial points underlying Plaintiffs' theory are not supported by specific allegations and that accepting their theory would require me to draw unreasonable inferences in Plaintiffs' favor. First, as stated *supra*,

---

[98]    765 A.2d 910 (Del. 2000).

[99]    2012 WL 1253072 (Del. Ch. Apr. 11, 2012).

[100]    2011 WL 4825888 (Del. Ch. Oct. 6, 2011).

Plaintiffs have not sufficiently alleged circumstances explaining why Golden Gate needed liquidity so severely that obtaining it would constitute a unique benefit to Golden Gate not shared by other Zale stockholders. This is especially true when compared to the facts alleged by the plaintiffs in *McMullin*, *In re Answers*, and *N.J. Carpenters* that enabled them to avoid a motion to dismiss.[101] In fact, based on the Complaint, it appears that if Golden Gate was parched for liquidity, it could have proceeded with the Secondary Offering that it already had initiated rather than undergoing a lengthy merger process. If, on the other hand, Golden Gate was seeking a higher price for its shares than it could attain through the Secondary Offering, then, presumably, it would want the highest possible price. In that case, Golden Gate's interests would be aligned with Zale's other stockholders and there would be no reason for it to attempt to depress Zale's stock price. I also determined *supra* that Plaintiffs' characterization of the $15.035 price referenced in the Preliminary Registration Statement as a "cap" was inaccurate.[102] Rather than constituting a maximum offering price that would result in a cap on Zale's share price, that price simply reflects the average of the high and low prices of Zale's common stock on September 30, 2013, calculated, as statutorily required, to estimate the eventual registration fee to be paid.[103] As a result, because Plaintiffs' own Complaint and the documents incorporated therein do not support their liquidity theory regarding Golden

---

[101] *See supra* text accompanying note 36.

[102] *See supra* note 3.

[103] *See supra* note 3.

Gate, I find that it is not reasonably conceivable that Plaintiffs could use that theory to demonstrate that the Director Defendants acted in bad faith.

**h.      Plaintiffs adequately have alleged that the Director Defendants breached their duty of care during the Merger process**

As stated above, because of Zale's 102(b)(7) provision, deciding whether the Director Defendants could have breached their duty of care is only relevant for purposes of determining whether Signet or Merrill Lynch could be liable for aiding and abetting those breaches. With that in mind, I have considered all of the deficiencies in the merger process Plaintiffs have alleged to determine which one or more of them might support a duty of care breach allegedly aided and abetted by Signet or Merrill Lynch. I find that the only deficiency that conceivably could constitute a breach of the duty of care is Plaintiffs' allegation that Rose was a senior member of both the Merrill Lynch team that made a presentation to Signet regarding a possible acquisition of Zale and the team that advised the Board in the Merger, but the Director Defendants did not realize that until after the Merger Agreement was signed. I conclude that Plaintiffs conceivably could show that the Director Defendants breached their duty of care as to this aspect of the sale process.

Although I already concluded *supra* that the Board did not act in bad faith during the Merger process, the standard for finding bad faith is more stringent than the standard for finding a duty of care violation. My analysis in this case, under the *Revlon* standard, focuses on whether the Director Defendants' actions fall within a range of reasonableness with the ultimate goal of maximizing the Company's sale price in mind. And, as the

48

Delaware Supreme Court held in a recent decision, "[w]hen a board exercises its judgment in good faith, tests the transaction through a viable passive market check, and gives its stockholders a fully informed, uncoerced opportunity to vote to accept the deal, [courts] cannot conclude that the board likely violated its *Revlon* duties."[104]

Based on the allegations in the Complaint, it appears that, for the most part, the Board has satisfied its duty of care by acting in an informed manner and reasonably exercising its business judgment. The Board met frequently throughout the Merger process, both before the Merger Agreement was finalized between Zale and Signet and afterwards, prior to the stockholder vote. The Board reasonably was apprised of Zale's value, having reviewed both management's projections and Merrill Lynch's Summary Valuation of Strategic Alternatives. In negotiating the Merger Agreement itself, the Board secured a fiduciary out and a reverse termination fee, while agreeing only to deal protections that consistently have been considered reasonable under Delaware law, and allowed for a passive market check via a three-month period between the signing of the Merger Agreement and the closing of the Merger. Even the final price itself cannot be said "to be so grossly off-the-mark as to amount to reckless indifference," given the support it garnered from Golden Gate and ISS and the fact that it fell within the valuation ranges relied on by Plaintiffs.

As to Merrill Lynch's belatedly disclosed presentation to Signet, however, I conclude that it is reasonably conceivable that the Director Defendants did not act in an

---

[104] *C & J Energy Servs. Inc.*, 107 A.3d at 1053.

informed manner. The Complaint acknowledges that the Board at least generally considered Merrill Lynch's potential conflicts in deciding whether to engage them and also relied on Merrill Lynch's representations that there were no such material conflicts. But, those facts alone are insufficient, on a motion to dismiss, for me to conclude that Plaintiffs could not conceivably prove that the Director Defendants breached their duty of care. As Vice Chancellor Laster observed in *In re Rural Metro Corp.*:

> [P]art of providing active and direct oversight is acting reasonably to learn about actual and potential conflicts faced by directors, management, and their advisors. . . . Because of the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives, directors must act reasonably to identify and consider the implications of the investment banker's compensation structure, relationships, and potential conflicts.[105]

In the context of detecting a preexisting conflict when engaging a financial advisor, this oversight duty could include negotiating for representations and warranties in the engagement letter as well as asking probing questions to determine what sorts of past interactions the advisor has had with known potential buyers, such as Signet here. In this case, it might have included a question as to whether the potential financial advisor had made any presentations regarding Zale to prospective buyers within, *e.g.*, the last six months or since Merrill Lynch had undertaken to represent Zale in the Secondary Offering. I also note that the Complaint alleges that the Negotiation Committee and the Board rather quickly decided to use Merrill Lynch, the only candidate they considered.

---

[105]    88 A.3d 54, 90 (Del. Ch. 2014).

50

In these circumstances, I consider it reasonably conceivable that the Board's measures—which, as described in the Complaint, consisted simply of discussing the possibility that Merrill Lynch would be conflicted and apparently relying without question on Merrill Lynch's representation that it had "limited prior relationships [with Signet] and no conflicts"—could constitute a breach of their duty of care in this *Revlon* context where Merrill Lynch failed to disclose in a timely manner the Signet presentation or Rose's involvement in it.[106]

---

[106] The threshold for finding a breach of the duty of care in the *Revlon* reasonableness context is lower than in the business judgment rule context. *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 192 (Del. Ch. 2007) ("What is important and different about the *Revlon* standard is the intensity of judicial review that is applied to the directors' conduct. Unlike the bare rationality standard applicable to garden-variety decisions subject to the business judgment rule, the *Revlon* standard contemplates a judicial examination of the reasonableness of the board's decision-making process. Although linguistically not obvious, this reasonableness review is more searching than rationality review, and there is less tolerance for slack by the directors."). Director liability for breaching the duty of care outside of the enhanced scrutiny context is predicated upon concepts of gross negligence. *McMullin v. Beran*, 765 A.2d 910, 921 (Del. 2000) (citing *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)). Delaware law instructs that the core inquiry in this regard is whether there was a real effort to be informed and exercise judgment. *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 968 (Del. Ch. 1996) ("Where a director in fact exercises a good faith effort to be informed and to exercise appropriate judgment, he or she should be deemed to satisfy fully the duty of attention."). To support an inference of gross negligence, "the decision has to be so grossly off-the-mark as to amount to reckless indifference or a gross abuse of discretion." *Solash v. Telex Corp.*, 1988 WL 3587, at *9 (Del. Ch. 1988) (internal citations omitted). Arguably, the Board's actions as to Merrill Lynch in this case constitute a breach of the duty of care under a gross negligence standard as well. I would reach that issue, however, only if I: (1) gave effect to the stockholder vote in accordance with the *KKR* decision; and (2) departed from *KKR* in the sense of considering the possibility not only of waste, but also of a breach of the duty of care based on gross negligence.

I also find it reasonably conceivable that Plaintiffs suffered damages as a result of this alleged breach. In a *Revlon* case, the Director Defendants' duty of care must be tailored toward the specific objective of maximizing the sale price of the enterprise. I agree with Plaintiffs that it is reasonably conceivable that Rose's presence on both the team that presented to Signet and the team that advised the Board would have undermined both his and Zale's credibility if they attempted to negotiate with Signet a price higher than $21. I recognize that Rose and Merrill Lynch may have maintained the ability to negotiate for a price higher than $21 per share after having told Signet, in a prior meeting, that they thought $17 to $21 per share to be a reasonable range for such an acquisition. But, drawing all reasonable inferences in Plaintiffs' favor, as I must, and considering the fact that the final price ended up being $21 per share, I find it reasonably conceivable that this undisclosed conflict hampered the ability of Merrill Lynch and, consequently, the Board to seek a higher price for Zale's stockholders.

Finally, I am not persuaded that the Board's three meetings after the Merger Agreement was signed and Merrill Lynch disclosed its presentation to Signet and their subsequent decision to proceed with the Merger cleansed the conflict. As an initial matter, I note that some of a board's financial advisor's conflicts arguably cannot be consented to in the proper discharge of a director's fiduciary duties.[107] Although I do not purport to decide, on this preliminary record, whether Merrill Lynch's actions constituted

---

[107] *See* William W. Bratton & Michael L. Wachter, *Bankers and Chancellors*, 93 TEX. L. REV. 1, 44, 56-61 (2014)

a "nonconsentable" conflict, I understand that the Board's *post hoc* meetings alone do not foreclose the possibility of a duty of care breach. In addition, even though the Board was aware of the conflict before they submitted the Merger for a stockholder vote, and thus retained the ability, via their fiduciary out in the Merger Agreement, to back out of the deal if they determined that the conflict resulted in an inadequate price, it is at least conceivable that some damage to stockholders already may have occurred. The Board engaged Merrill Lynch on November 18, 2013 and did not discover the conflict until March 23, 2014.[108] The Merger Agreement reflecting the $21 per share Merger Price was signed on February 19, 2014. It is reasonable to infer that the time and money expended by the Board negotiating the Merger with an arguably conflicted financial advisor during those four months constituted actual damage to Zale and its stockholders. In addition, if the Board did decide to execute its fiduciary out, it would have had to pay Signet the $26.7 million termination fee. Alternatively, if the Board chose to get a second financial advisor's opinion, it would have had to pay a fee to both Merrill Lynch and the advisor. Thus, I conclude that it is reasonably conceivable that even if the Board decided that they left some money on the table as a result of Merrill Lynch's conflict, they may have found that the additional costs required to remedy that conflict—*i.e.*, backing out of the Merger or seeking a second fairness opinion—outweighed any such benefits. Either way, it is possible that Zale's stockholders would have been harmed by the breach.

---

[108] Compl. ¶ 61.

53

Thus, although the Director Defendants are shielded from monetary liability under the 102(b)(7) provision, I conclude that Plaintiffs adequately have alleged that they breached their duty of care.

## C. Counts II & III – Aiding and Abetting the Director Defendants' Breaches of Fiduciary Duties By Signet and Merrill Lynch

Finally, Counts II and III of the Complaint claim that Signet and Merrill Lynch aided and abetted the Director Defendants' alleged duty of loyalty and duty of care breaches by knowingly participating in such breaches. I address those claims below, and conclude that Count II should be dismissed under Rule 12(b)(6) for failure to state a claim, but that Count III should not be dismissed.

### 1. Legal standard

To state a claim for aiding and abetting, a plaintiff must allege: (1) the existence of a fiduciary relationship; (2) a breach of the fiduciary's duty; (3) knowing participation in that breach by the defendants; and (4) damages proximately caused by the breach.[109] The key inquiry on the aiding and abetting claim is whether a plaintiff has pled adequately the third element, knowing participation. Although there is no requirement that a plaintiff plead knowing participation with particularity, a plaintiff must allege facts from which knowing participation may be inferred to survive a motion to dismiss.[110] Significantly, however, "[t]his Court has consistently held that evidence of arm's-length negotiation

---

[109] *Malpiede*, 780 A.2d at 1096.

[110] *In re Telecomms., Inc.*, 2003 WL 21543427, at *2 (Del. Ch. July 7, 2003).

with fiduciaries negates a claim of aiding and abetting, because such evidence precludes a showing that the defendants knowingly participated in the breach by the fiduciaries."[111]

Because an underlying fiduciary duty breach is needed in order for an aider and abettor to be found liable, and because the only alleged breach Plaintiffs have adequately pled is the Director Defendants' breach of their duty of care, I analyze next whether it is conceivable from the facts alleged in the Complaint that either Signet or Merrill Lynch "knowingly participated" in that breach.

**2.      Plaintiffs fail to allege that Signet aided and abetted the Director Defendants' duty of care breach**

Plaintiffs argue that "Signet was aware that Zale was using a conflicted advisor, having been pitched by Merrill Lynch as to why it would be a good idea for Signet to acquire Zale."[112]  According to Plaintiffs, Barnes knew that Rose was a part of both the team that made the presentation to Signet and the team that was advising Zale.  As a result, Plaintiffs claim that Signet knowingly participated in the Director Defendants' breach of the duty of care in that Barnes knew that Merrill Lynch could not request credibly a price above $21 per share and that he used that handicap to his advantage during negotiations.  This argument, however, misidentifies the essence of the Board's duty of care breach that I found the Complaint adequately pled.

---

[111]    *In re Frederick's of Hollywood, Inc.*, 1998 WL 398244, at *3 n.8 (Del. Ch. July 9, 1998).  *See also In re Gen. Motors S'holder Litig.*, 2005 WL 1089021, at *26 (Del. Ch. May 4, 2005).

[112]    Pls.' Answer Br. 59.

Because the Board's duty of care breach was predicated on Merrill Lynch's non-disclosure of the presentation to Signet to Zale's Board, rather than the presentation itself, Signet could not have participated knowingly unless it was aware of such non-disclosure. The Complaint does not allege, however, that Barnes or anyone else at Signet knew that Merrill Lynch had not informed the Board of their previous presentation to Signet. Hence, it is reasonable to infer that Barnes believed that Merrill Lynch already had disclosed the presentation to the Board either before it was engaged as its financial advisor or, at least, before the final Merger Price was negotiated. I do not consider it reasonable to infer that Signet would have understood otherwise based on the facts alleged in the Complaint.

Further, as Zale's counterparty in the Merger's negotiations, Signet was under no obligation to reveal Merrill Lynch's presentation. "[T]his Court has consistently held that evidence of arm's-length negotiation with fiduciaries negates a claim of aiding and abetting, because such evidence precludes a showing that the defendants knowingly participated in the breach by the fiduciaries."[113] Thus, because there are no allegations in the Complaint that would support an inference that Signet knowingly participated in the Board's duty of care breach, I conclude that Count II must be dismissed.

---

[113] *Dent v. Ramtron Int'l Corp.*, 2014 WL 2931180, at \*17 (Del. Ch. June 30, 2014) (citation omitted).

56

### 3. Plaintiffs successfully allege that Merrill Lynch aided and abetted the Director Defendants' duty of care breach

Plaintiffs also argue that Merrill Lynch knowingly participated in the Board's duty of care breach because "[a]fter making its presentation to Signet, Merrill Lynch and Rose failed to inform the Board that Merrill Lynch had sought to represent Signet in an acquisition of Zale."[114] Unlike their argument as to Signet, Plaintiffs' contentions as to Merrill Lynch's alleged aiding and abetting directly relate to the Board's alleged duty of care breach and demonstrate knowing participation. In their Opening and Reply Briefs, Merrill Lynch mostly concentrates on arguing that: (1) Plaintiffs do not allege any damages resulting from Merrill Lynch's presentation to Signet; and (2) any taint from the alleged conflict was cleansed as a result of their disclosure to the Board and the approval by the fully informed vote of a majority of disinterested stockholders.[115] For the reasons stated in the discussions of these issues *supra*, I do not find either of these arguments persuasive.

More relevantly, Merrill Lynch also contends that they did not knowingly participate in any fiduciary duty breach because the Complaint does not allege that they "conspired with anyone."[116] A conspiracy, however, is only one way in which knowing participation can be found; Plaintiffs can also make "factual allegations from which

---

[114]   Pls.' Answer Br. 57.

[115]   Merrill Lynch's Opening Br. 17-24; Merrill Lynch's Reply Br. 3-10.

[116]   Merrill Lynch's Opening Br. 16 (quoting *McGowan v. Ferro*, 2002 WL 77712, at *2 (Del. Ch. Jan. 11, 2002)).

knowing participation can be inferred."[117]   In this case, Plaintiffs have made such allegations.  They allege that Rose was a member of both the team that presented to Signet and the team that advised the Board, which satisfies the "knowledge" component of the inquiry.  Further, the Complaint alleges that Rose made the conscious decision not to disclose this conflict to the Board.  Although Rose purportedly relied on advice from Merrill Lynch's conflict clearance department in not disclosing his conflict to the Board, Merrill Lynch is not absolved of liability as a result of such reliance.  It is also reasonably conceivable that Rose, as Plaintiffs allege, purposefully avoided disclosure because he hoped to generate fees for Merrill Lynch and a larger bonus for himself.  As to the "participation" prong of the inquiry, it was Merrill Lynch's decision to delay disclosure of the conflict until March 23, 2014 that caused me to find that the Director Defendants' breach of their duty of care conceivably damaged stockholders.  Had Merrill Lynch disclosed the conflict before being engaged by the Board, it would have mooted any claim that the Board breached their duty of care by not taking further steps to discover or remedy such a conflict.  On the truncated record before me on Defendants' motions to dismiss, I can only speculate as to why the topic of Merrill Lynch and Rose's prior presentation to Signet apparently did not come up in connection with the decision of the Board to make a counter offer of $21 per share as opposed to something higher, in response to Signet's all cash offer of $20.50 per share.  As a result, I conclude that

---

[117]     *McGowan*, 2002 WL 77712, at *2 (quoting *Malpiede,* 780 A.2d at 1097-98).

58

Plaintiffs adequately have alleged that Merrill Lynch knowingly participated in, and therefore aided and abetted, the Director Defendants' duty of care breach.

### III.    CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are granted in part and denied in part. Specifically, Counts I and II are dismissed with prejudice. I deny the motions as to Count III.

**IT IS SO ORDERED**.